Good morning, Your Honors. This is probably the most important case I've ever had the privilege of bringing before the Ninth Circuit Court of Appeals. And if you'll forgive me, I'm just recovering from the flu. I'll do my best to enunciate clearly today. Can you introduce yourself for the record, please? Pardon? Could you introduce yourself for the record, please? Yes, I'd be happy to. My name is Gary Dubin, D-U-B-I-N. I represent Mr. Mapuatuli, Mr. Medina, and also myself. In reviewing last night the different issues in the case, I came up with six different viewpoints that need to be examined. Just briefly, let me ask you a question first. The district court gave a reasoned decision in granting the government's motion, and your opening brief to this court addressing that actually didn't address that. I don't think a single one of the reasons given by the district court is discussed in the opening brief. Why is that? And why shouldn't we consider the arguments in response to the district court decision to have been waived because you didn't present them in the opening brief? Well, I think the issues were discussed. The court, in its opinion, as I recall, challenged the standing of an attorney to object. Where in the opening brief is that discussed? As I recall, I point out that it is a violation of the work product of the attorney. I searched for the word standing in the opening brief, and I didn't find it anyplace. How about Hecht v. Humphrey? Where is that discussed in the opening brief? I don't think that that is relevant to the case. But the district court did. So where is your challenge of the district court's order actually discussed in the opening brief? It's discussed in the reply brief. Was that good enough? Don't we have law that says issues not discussed in the opening brief are waived? There were a lot of issues discussed. Yeah, but none of the district court's reasons were discussed. I mean, that's pretty remarkable. It's like the district court's decision didn't exist. You're taking a mulligan on that one and trying again with us. You can get to the issues, but I don't see how the issues haven't already been waived. Well, the court will note on page 11 of the opening brief, I talk about the attorney-client work privilege. And the court actually talked out about the work privilege, the attorney-client privilege, and says it's been waived because of the notices on the e-mail system. And I don't see that discussed in the briefing place either. I don't see any of the reasons. That's what stuns me. I don't see a single reason discussed by the district court talked about in the opening brief. You waited until the reply brief to deal with any of them because the government brought them up in the answering brief. I believe the waiver issue was discussed in the opening brief. I basically discussed the important issues in the case. There are things that the court did not discuss in its order that I thought were highly relevant, which I also discussed. The six major issues, one is practicality. You can look at it from the viewpoint of a defense attorney trying to defend a client. And the other alternatives that are available are not as good as e-mail. You can look at it from that point of view. Two, you can look at it from the constitutional issues as to the right to counsel and an offshoot of the Gideon case. Three, you can look at the prison policy issues. There's no reason here. There's no security issue here, for example. But there is prison policy here in terms of the administration of this e-mail system. Why didn't you bring this under the PLRA? Well, this is a policy of the Justice Department. But you have a client who is specifically raising questions as to the interference of his individual e-mail correspondence with others out of the prison. No, but that's a Justice Department policy that the prison system has no control over because it's not determined by the Bureau of Prisons, not determined by the detention center. It's determined by the Justice Department. The issue came up in a couple of prior cases, and it was clearly established that that was the policy of the Justice Department. You mean the prison system couldn't respond to a PLRA request by saying, well, okay, we'll make the disclaimers in larger print or improve the notice to all users that all communications are going to be intercepted? Well, that would be nice, but that wouldn't solve the problem because you still have the practical problem of the fact that the e-mail system should be available. Without interference? Without interference. So just as the legal mail system is available without interference. Where is the exception to the PLRA? Because it's drafted very broadly. It says no action with respect to prison conditions can be brought until such administrative remedies are available or exhausted. So are you saying that there were not administrative remedies? Because the Supreme Court has said you need to exhaust administrative remedies even if you can't get what you're seeking, the relief you're seeking. There is no effective remedy through the procedure. But the Supreme Court has said that doesn't matter. So if you're seeking damages or whatever remedy you're seeking, even if it's not available from the prison administration, you still have to exhaust the remedies they've said in several cases. Well, this particular issue has never been before the United States Supreme Court. It doesn't appear to have been before the Bureau of Prisons either because you didn't exhaust it. You want us to take your say-so for the fact that it's necessary and there's no way to solve the problem instead of letting the Bureau of Prisons address it. Well, it was brought to the attention of the district courts in New York. I point that out. And the Attorney General at that time. So you think your exhaustion or your client's exhaustion requirement under the Prison Reform Act is satisfied because somebody filed a lawsuit about particular facts in New York. Any authority to support that proposition? I take it the answer to my question is no. It's beyond the power of the Bureau of Prisons. How is it beyond the power of the Bureau of Prisons? Because they're following a policy procedure of the Justice Department. Bureau of Prisons is within the Justice Department. But they don't. You can make proposals as to how the policy should be written. Well, you know. There's a serious problem potentially here. I don't know the facts of your clients raise it very well, but there is a serious problem. But this lawsuit doesn't tee that problem up either procedurally or substantively. Well, we've had many committees like in New York that have tried to recommend changes. No changes have been. They may have exhausted remedies and maybe they can file a lawsuit. Is that what you're telling me? But that doesn't tell me why your client can file a lawsuit here without having done anything. You know, I don't think the matter came up in, for example, the Gideon case. This is a constitutional issue regarding the. Did Gideon file his paper in the U.S. Supreme Court? Is that the first stop? It's not the first stop. But you think it should be the first stop for you? We started in the United States District Court. Is that the first stop? In this case, it was the first stop. I complained in the. There were three cases, one of which I was counsel. The other two, I was advisory counsel in those cases. We had the three different defendants had the same issues regarding misconduct by the homeland security officials. The same officials. We listed all three defendants as witnesses in the cases. And we were stonewalled. We were not allowed to bring those other witnesses in for our issues. I can't relate what you're saying to this lawsuit. What's the Department of Homeland Security have to do with this? Well, there's always an issue, and that was actually number five I was going to bring up. There's always an issue of procedurally, how do you attack these problems? And my clients were in detention. Well, if it's a prison condition problem, you're supposed to attack it by filing a grievance. My clients were in detention. They had not been convicted, unlike the Keck case, the Heck case. But as long as they're in detention, they can always file a grievance. They don't have to wait for anything, do they? We've held that the PLRA is applicable to pretrial detainees. Oh, but the Heck case could be interpreted to mean that they didn't have a remedy after they were convicted. That's a distinction. Oh, you've got a remedy. You have to bring the remedy in the case in which they were convicted, also in federal court. I mean, indeed, I'm puzzled. The relief you seek seems to me relief that should be requested in federal habeas in their federal criminal prosecutions, and yet an entirely different lawsuit is being brought to challenge what happened in their criminal case. Why isn't it filed in the criminal case? Because it's much broader than one particular defendant. You had any authority to support the proposition because the problem was broader, individual requirements for exhaustion are waived? Well, that begs the question whether there is a requirement for exhaustion or not. Well, I think we're already past that. Now you're trying to explain to me why a separate lawsuit was filed rather than challenging your client's criminal convictions or continued confinement in their criminal cases. Why isn't that a more logical place to raise exactly the same challenges you're trying to raise in a separate lawsuit? In the Arciero case, I did, and I was refused. Okay, so you appeal that. That's the appeal that might raise the issues, but why a separate lawsuit? Look at it this way. There's a person charged with a crime. They're in detention. They're arguing that their right to defense counsel was violated by interference. We had evidence submitted by Homeland Security that they went into the file, into the e-mail files of Arciero, and they had a search based upon Medina. So they admitted that. There's actually a form that allows them to go in and get the e-mails. None of this is answering me why he couldn't have challenged it in his own lawsuit. I mean, a few minutes ago you gave me Gideon as something establishing a broad rule, and that was a case brought by Mr. Gideon with regard to his own conviction. Why didn't your clients do the same thing? It's easy to answer that because that would take maybe three or four years. The person is sitting in detention facing criminal charges. Wait a minute. How is that any different than filing an entirely separate lawsuit and bringing an entirely separate appeal? How could it be any slower to bring it in this criminal conviction? I asked for some immediate relief from Judge Kobayashi. And why couldn't you ask that from the judge who presided over the criminal conviction? Same issues. At least there you don't have a heck problem. I tried that. Well, you should have appealed that case maybe. How long would that take? How would that take longer than this case did? Among other things, criminal cases have priority, so they move faster on appeal. Well, Tully's appeal, which I ultimately did not handle, that was still ongoing. That's been several years. I guess I conclude just by saying that these are important constitutional issues that ought to be addressed. And I concede that sometimes the courts are more interested in laborious intellectual exercises rather than the circumstances of the individual defendant. Maybe that's something that client's lawyer should consider. Well, I think if that had been applied to Gideon, we might not have had that rule. I think we have your argument. Thank you. Your time is up. Thank you very much. Good morning, Your Honors, and may it please the Court. Michael Albanese on behalf of the Federal Appellees. The Court aptly noted that the District Court in this case found summary judgment on behalf of the Federal Appellees for four reasons. That there was no Sixth Amendment violation, that the relief sought by appellants in this case would undermine the validity of their criminal convictions and thus was barred by Heck v. Humphrey, that Mr. Medina and Mr. Mapuetuli failed to exhaust the administrative remedies as required by the Prison Litigation Reform Act, and that Mr. Dubin has no standing to bring a Sixth Amendment claim in his own right. The allegations in the complaint are very specific. They relate to two criminal defendants, and they relate to that the United States improperly eavesdropped on conversations between those defendants and Mr. Dubin in the criminal cases. The appellants in this case have failed to demonstrate, one, that there was a violation of the attorney-client privilege because it was clearly waived, and, two, that there was any prejudice that resulted from that in the criminal prosecution of the two defendants. Now, the warnings that the Trulink system uses are in the record, and they're before the Court. And just to summarize them, the inmate detainee has to agree to the one-page warnings every time they utilize the system. And there's three paragraphs, and in each paragraph it mentions that the communications are monitored and specifically that this system is not to be used for attorney-client communication. In addition to that, when Mr. Dubin signed up for the system, he was warned that the system was monitored. And every time he received a message through the system, he was re-warned that the system was monitored. And in the face of all those warnings, this is essentially the circumstance where an attorney and a client engaged in communications in a crowded room with law enforcement present. And that's a circumstance that in the United States began before this Court, where this Court held that where the client knew or should have known that his communications were not confidential, then the attorney-client privilege was waived. And that's clearly the case here. Let me pose to you the question that does give me concern here, which is that it may be that the federal detention center is, I don't know, five miles from downtown, but we have lots of federal prisoners incarcerated a pretty substantial distance from where their lawyers are located. Even Mr. Dubin's current clients on appeal, I suspect they're probably, because they're subject to long terms, they're probably incarcerated someplace on the mainland. And so it's not as simple for a lawyer and client to meet and consult. Legal mail is still available, but the reality is that communications today much more commonly take place electronically. I wouldn't want to count up the number of e-mails I get each day compared to the number of letters. I suspect the same is true with you. But the fact that prison officials and law enforcement are allowed to inspect e-mails makes that mode of communication effectively unavailable for many attorney-client communications. Why isn't that a problem? Well, Your Honor, what I think Your Honor is saying is that in a different circumstance where a particular plaintiff was able to demonstrate that they did not have adequate access to counsel utilizing in-person visits, legal mail, and confidential telephone communication, all of which were available to the defendants in this case and were not disputed below, upon such a showing, the issue would be teed up, as Your Honor said, for the Department of Justice to have to explain the rationale and the justification for the existence of the true link system the way it is. And that's not in the record in this case because those are issues that did not need to be reached to decide summary judgment in the government's favor in this case. The true link system, what is in the record in the declaration by Ms. Jenkins of the BOP, the true link system was created for a number of reasons, one of the most important of which is that by allowing inmates and detainees to communicate with loved ones, with friends, through this e-mail, it would greatly reduce the burden on prison staff to search physical mail, which they must do in every case to make sure that there's not contraband. And it's an effective tool in that regard. Now, the record is not fully developed in this case as to why the prison, why BOP has determined that the e-mail system should be the way it is, fully monitored, because those issues are not necessary, those facts were not necessary to arrive at the conclusion that the district court did that the government is entitled to summary judgment in this case. So I see Your Honor's concern, and indeed that concern has been raised in law review articles and policy discussions, but what's relevant in this case is whether these appellants have stated or have brought a Sixth Amendment claim that requires the invalidation of the criminal convictions of Mr. Medina and Mr. Mapulatuli and the BOP to change its true links policy, and they have not done so here. And even if Your Honor is correct about, even if these are very important issues to discuss, it is clearly the case that those issues would have to be brought through the Prison Litigation Reform Act process. An inmate would have to grieve that and explain what the hindrances are in their communications with their attorney, and the BOP would have the opportunity to resolve that issue either at the facility level by, as Judge O'Scanlan stated, by perhaps making the warnings bigger or by removing some other impediment in attorney-client communication, or at the BOP-wide level. There's no reason why a BOP could not, if, I'll rephrase that. There's been no showing by appellants that the BOP is incapable of creating a brand-new system. They may very well have good reasons why they don't want to do that, but it's certainly not inconceivable that a new system could be created. Are there any existing exceptions to this system? Well, Your Honor, it's not part of the record, so I want to, with the caveat that that hasn't been put in the record, I can say as an AUSA practicing in this district that many districts, and this district included, put in backstops to prevent the attorney-client privilege for communications from reaching prosecutors, usually with the use of a taint team, within the prosecutor's office. But that's in an abundance of caution because the prosecution team doesn't want some minor detail that was inadvisably discussed on an e-mail system to ruin or call into question a perfectly valid prosecution. But the government takes the position that the prosecution team would be well within their rights to review every e-mail, or every electronic message that takes place in this system because the attorney-client privilege is clearly waived and the inmates are advised that the system is not to be used for that purpose. If I could briefly address the Heck v. Humphrey rationale, I think it's even more clear why Heck v. Humphrey and the cases that follow it are important and good law in this case. Mr. Maputuli and Mr. Medina both have active criminal appeals that are before this court, and, in fact, I believe Mr. Medina's is before this panel and was submitted on briefs. On Monday. And the court can take judicial notice of what's in the opening briefs in both of those cases, but there is no mention of the violation of attorney-client privilege or the Sixth Amendment in either case. Let me ask you this. If we got past the PLRA and reached the merits and said there's a Sixth Amendment violation by the BOP reviewing or by the prison reviewing these attorney-client communications, why would that necessarily demonstrate the invalidity of their conviction? Wouldn't there have to be a showing of prejudice or that any error was harmless or is it a per se structural error? That's right that there would have to be, in order to show a Sixth Amendment violation, there has to be a showing of prejudice. And so if the court here reached the merits and found there to be a violation of the Sixth Amendment, implicit in that finding would be prejudice. If a violation of the attorney-client privilege standing alone is not a violation of the Sixth Amendment, it requires that additional component of a demonstration of prejudice. So in his criminal case, I mean there could be a determination that government review of attorney-client communications violates the prisoners or the pretrial detainees' Sixth Amendment right, just like we had a 28-J letter with two cases that said you could state a claim on that basis. But with respect to the conviction in the criminal case, I'm not sure why that violation would necessarily show that his conviction was invalid. And so it wasn't clear to me why there was a HECBAR issue here. So I think the way that I think of the case is that if this was a different lawsuit that was complaining about that the inmate and the attorney know that the system is monitored, and because that system is unavailable to them to communicate confidentially, that itself is an undue restriction of the Sixth Amendment protections, that case might not, success in that case might not invalidate the criminal conviction of the inmate defendant in that case. In this case, the allegations that support the appellant's Sixth Amendment claims are specifically that the prosecution, in their criminal cases, reviewed trial strategy e-mails between Mr. Dubin and Mr. Medina and Mr. Mapuatuli. And so under those circumstances, if a court, in this case the district court or this court, found that the Sixth Amendment was violated with regard to the government eavesdropping on those e-mails and discovering the trial strategy, it at least calls into question the conviction, and perhaps there would need to be more discussion of the effect, the harm, but certainly it would call closely into question the validity of those criminal prosecutions. In Ahabia's case, that would probably be a good argument for saying there was reversible error. Is that right? Or if he had raised it in his criminal appeal, there would be an argument that that was reversible error. That's right. But it's not per se reversible error, or do we have a case saying that's per se reversible error? I would agree with that, that it's not per se reversible error, but certainly what appellants have asked for in terms of relief in this case is the reversal of their criminal convictions. So how I imagine that Mr. Dubin and his clients see the lawsuit playing out is that if they reached the merits below, they would introduce evidence demonstrating that they were entitled to reversal of their conviction. Is that consistent with the Heck line of cases, though? I thought the error was success in the complaint would necessarily demonstrate the invalidity of the conviction is the terminology we use. Right, and that's why here if they made it all the way to the merits and in order to achieve the relief that they're seeking, which is the reversal of their criminal convictions, they would have to put on evidence that the Sixth Amendment, the alleged violations of the attorney-client privilege caused harm and prejudice in their criminal cases. If they did so successfully, that would absolutely and necessarily invalidate their criminal convictions. So the focus is on that part of the relief sought by the complaint? That's right. There could be a claim in the complaint for injunctive relief, for example, that would not challenge the invalidity. It's the piece of the relief that says my rights were violated, and so the relief should include knocking out my convictions. That's the part that you contend runs into Heck. Right. I think the way that this complaint – But could you find – I mean, I guess it seems that there's two different claims here. One is my conviction is unlawful. The other one is I'm entitled to injunctive relief for the way the prison is being run, for prison conditions. I mean, couldn't they succeed on the prison conditions claim and still lose in their criminal conviction? Well, I agree with the way that Your Honor separates the two issues, but I don't think that they could succeed on the prison conditions claim based on the allegations in this complaint. I don't think they've adequately raised it. Because of the waiver? Pardon? Because of the waiver? The allegations in the complaint relate to past violations of – past specific violations of the Sixth Amendment rights regarding their criminal charges. But you argued earlier that because of all these notices that the Sixth Amendment right was waived. Absolutely, Your Honor. I was addressing Judge Ikuda's point about hypothetically if a Sixth Amendment case could be made out, would that necessarily invalidate the criminal conviction? Our overarching argument and position in this case is that there is no Sixth Amendment violation because the attorney-client privilege was unquestionably waived every time they communicated on the system. Okay. Any further? Thank you. Thank you. Okay. Any questions? Okay. The case of Mapuatuli v. Sessions is submitted.
judges: O'scannlain, Clifton, Ikuta